FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2012 JAN 25 PM 1:33

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

TIMOTHY ALAN CONNELL,

        Plaintiff,

v.                        Case No. 3:10-cv-221-J-20JRK

WAYMAN E. TATE, et al.,

        Defendants.

---

## ORDER

### I. Status

Plaintiff, an inmate of the Florida penal system who is proceeding pro se, initiated this case by filing a Civil Rights Complaint (Doc. #1). He is proceeding on an Amended Complaint (Doc. #18) (Amended Complaint) filed on July 14, 2010. Wayman E. Tate, Danny Thompson, Michael Esford and Keisha Cain are the remaining Defendants. See Clerk's May 17, 2011, Entry of Default (Doc. #51) against Defendant Keisha Cain. The Motion for Default Judgment against Keisha Cain was denied without prejudice. See Order (Doc. #63).

Plaintiff contends that Defendants Tate and Thompson subjected him to cruel and unusual punishment in violation of the Eighth Amendment when they used excessive force and

1

physically assaulted him.[1]  He also claims Defendants Tate and Thompson committed assault and battery, in violation of state law.  Plaintiff alleges that Defendants Esford and Cain failed to intervene and protect Plaintiff when he was being physically assaulted by Defendants Tate and Thompson.  Plaintiff claims that Defendants Esford and Cain committed a state tort of negligence by their failure to intervene and protect.  As relief, Plaintiff seeks compensatory and punitive damages and injunctive and declaratory relief.

This cause is before the Court on Defendants' (Tate, Thompson and Esford) Amended Motion for Summary Judgment (Doc. #32) (hereinafter Motion for Summary Judgment).[2]  The Court advised Plaintiff of the provisions of Fed. R. Civ. P. 56, and gave him an opportunity to respond.  See the Court's Order (Doc. #6).  Plaintiff has responded.  See Plaintiff's Brief in Opposition to Defendants' Summary Judgment Motion (Doc. #37); Plaintiff's Statement of Disputed Factual Issues (Doc. #38); Plaintiff's Declaration in Opposition to Defendants' Motion for Summary Judgment (Doc. #39); Plaintiff's Supplement (Doc. #71);

_____

[1] Plaintiff claims that Officer Darious Inzar was involved in the excessive use of force, but Defendant Inzar was dismissed from this action on December 1, 2010.  See Order (Doc. #41).

[2] The Court will refer to the exhibits appended to the Motion for Summary Judgment as "Ex."

and Plaintiff's Supplemental Response to Defendants' Amended Summary Judgment (Doc. #74).

## II. Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007) (citations omitted).

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548).[3]

Id. at 1314.

---

[3] Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

3

### III. Plaintiff's Allegations

Plaintiff alleges the following facts in his Amended Complaint. On June 23, 2009, at 6:00 p.m., while housed at Union Correctional Institution (hereinafter UCI), Defendants Tate and Thompson approached Plaintiff cell and told him to pack his property in preparation for relocation to the disciplinary status wing. Plaintiff's cell was needed for inmates on suicidal and homicidal observation. Plaintiff refused to relocate to the disciplinary confinement wing because of the constant noise and disruption on that wing. Plaintiff requested to stay on the non-disciplinary status wing, a more peaceful environment. This request was denied, but Plaintiff still refused to move. Defendant Tate became upset with Plaintiff and told him if he did not cuff up, he was going to beat his ass. Tate and Plaintiff argued, both using abusive and threatening language. Defendants Tate and Thompson exited the wing to summon the lieutenant.

Shortly thereafter, Lt. Kilgore and Lt. Salle arrived at Plaintiff's cell, and Plaintiff told them Tate hand threatened to beat him for refusing to relocate. Plaintiff told them he feared for his safety. The lieutenants left to consult with Defendant Tate, returned to Plaintiff's cell, and Lt. Salle assured Plaintiff that nothing would happen to him. Plaintiff agreed to move to the disciplinary confinement wing.

4

On June 24, 2009, at 5:20 p.m., Defendant Tate refused to feed Plaintiff his evening meal. Tate told Plaintiff he wanted Plaintiff to go to the showers tomorrow for a one-on-one, meaning a fist fight without Plaintiff being handcuffed. Plaintiff refused, believing this to be a ploy to get him to come out of his cell to be jumped on in handcuffs.

On June 25, 2009, at approximately 6:20 p.m., Defendant Thompson and Officer Inzar approached Plaintiff's cell during showers and asked him if he was going to come out and fight Defendant Tate. Plaintiff said yes in order to get them to open the food flap. When the flap was opened and he was ordered to submit to handcuffs, Plaintiff placed both hands on the flap to prevent it from being closed. He did this in hopes of getting a lieutenant to come to the wing so he could inform the supervisor of Tate's plan to attack him and the officers' refusal to feed him for the previous two days. Officer Inzar told Plaintiff that the lieutenant was not coming and to cuff up. Plaintiff refused. Officer Inzar grabbed Plaintiff's wrists with both hands, pulled them towards him, and directed Thompson to cuff Plaintiff. Defendant Thompson cuffed Plaintiff and connected the snatch cable to the door to prevent Plaintiff from pulling his hands back into the cell. The cell door was opened, and Defendant Thompson and Officer Inzar escorted

Plaintiff to the quarterdeck, where Defendant Tate was awaiting his arrival.

When Plaintiff arrived on the quarterdeck in front of the control room, Tate immediately grabbed Plaintiff's handcuffs and forced Plaintiff into the Sergeant's Office. Defendant Tate began punching Plaintiff in the upper torso and stomach, knocking the wind out of Plaintiff and knocking Plaintiff to the ground. Plaintiff balled up into a fetal position. Defendants Tate and Thompson and Officer Inzar began kicking and punching Plaintiff in the back, side, buttocks and head. Plaintiff made pleas for them to stop. At one point, Defendant Thompson kicked Plaintiff in the left eye. Defendant Tate asked Plaintiff if he was going to be disrespectful anymore. When Defendant Tate noticed that Plaintiff's eye was swelling, he ordered Thompson and Inzar to stop the beating.

At that point, Plaintiff's handcuffs were switched to the back, and he was escorted out of the Sergeant's Office. As Plaintiff exited the office, he noticed Defendants Michael Esford and Keisha Cain standing by, in the Control Room, watching the incident. They were watching through the open door to the Sergeant's Office, and they failed to intervene to protect Plaintiff, although they were in a position to intervene and they had the opportunity to intervene.

Confinement Lieutenant Watson arrived, and Plaintiff was escorted from the holding cell to the medical station for a post use-of-force medical examination. Nurse Bickel examined Plaintiff's body and found the following injuries: bloody coloration to the left eye and a black left eye, swollen and bruised left eye area, a large bruise to the left side, superficial lacerations to the upper torso and head area, a swollen knot on his forehead and on the top of his head, and redness to the back, neck, elbow and stomach areas. Plaintiff was examined by Dr. Aviles on June 26, 2009. X-rays were ordered and a thirty-day supply of 800 mg Motrin was prescribed. The x-rays were negative. For days after the beating, Plaintiff was in pain. The pain subsided after a couple of weeks. Plaintiff continues to suffer from anxiety, paranoia, loss of sleep, and mental and emotional distress and nightmares.

### IV. Defendants' Motion for Summary Judgement

The Defendants specifically deny beating Plaintiff or abusing him in any way and deny failing to intervene to prevent a beating or abuse. They also deny refusing to feed Plaintiff. Specifically, in his Affidavit, Defendant Tate states:

> At approximately 1820 hours on June 25, 2009, while assigned as O Dorm Housing Supervisor at Union C.I., I was on the quarterdeck downstairs in O Dorm when Officer D. Inzar and Officer D. Thompson were escorting inmate Connell, Timothy #T11890, housed in O2-124S, off of wing two. I asked Officers Thompson and Inzar

7

why inmate Connell had his hands handcuffed in front of his body. They stated that inmate Connell had complained of an injury to his shoulder, which Connell said he had sustained while doing exercises inside his cell. Inmate Connell said his shoulder injury was very painful, necessitating his hands not be [sic] placed behind his back for handcuffing.

As they explained this, I stepped closer to them and inmate Connell and placed my left hand on the wrist restraints. Inmate Connell jerked his hands away in an aggressive manner at which time it became necessary to use force to defend myself and the other staff. I grasped inmate Connell's left rear shoulder with my right hand and forced him to the floor, face down, causing him to strike his head on the floor. Inmate Connell jerked and twisted his body and broke my hold, refusing multiple orders to cease resisting. With the assistance of Officer Inzar, I again grasped inmate Connell's upper left arm with both hands. At this time[,] we were on the floor at the entrance of the sergeant's office. During the struggle, and with the assistance of Officer Inzar, I utilized my body weight to pin inmate Connell to the floor as he continued to resist by jerking and twisting his body, still refusing all orders to cease resisting. Inmate Connell finally ceased resisting.

I then repositioned both of my hands to inmate Connell's upper left arm and, with the assistance of Officer Inzar, assisted him to his feet. I then released my grasp and no further force was used by me. Once inmate Connell regained his footing, Officer Thompson uncuffed one of inmate Connell's wrists. Inmate Connell placed his hands behind his back and Officer Thompson re-secured the handcuff. Officer Inzar and Officer Thompson then escorted inmate Connell into the holding

8

cell. They exited the cell and secured the door. No further force was used. I notified Lieutenant Willie Watson, who responded to O Dorm. I also instructed N Dorm Officer Bernard Anderson via radio to act as camera operator. Officer Anderson retrieved the O Dorm handheld video camera and began videotaping at approximately 1835 hours. Lieutenant Watson conducted his lead-in statement at approximately 1845 hours.

Inmate Connell was escorted to O Dorm medical treatment room, by Officer D. Gibstein and Officer J. Carter, where he received a post use of force physical conducted by SLPN S. Bickel. SLPN Bickel noted the following injuries: discoloration to the left eye and superficial abrasions to the forehead, nose, neck, upper torso, rear thoracic area and left elbow. Officers Gibstein and Carter then escorted Inmate Connell back to his assigned cell and secured the door. Officer Carter removed the handcuffs through the handcuff port, at which time Inmate Connell stuck both arms through the handcuff port and refused to place them back inside the cell. Lieutenant Watson repeatedly ordered Inmate Connell to place his hands back inside the cell. Inmate Connell finally complied. Videotaping concluded at approximately 1905 hours.

Officer Inzar and I each received a post use of force physical by SLPN Bickel with no injuries noted. Duty Warden Ronnie Woodall was notified of the incident. A Disciplinary Report for 1-19, Attempted Assault on a Correctional Officer, was processed for Inmate Connell.

I never stated to inmate Connell or anyone else that I wanted to fight inmate Connell. I never threatened inmate Connell by stating I was going to "beat his ass."

The June 25, 2009 use of force against inmate Connell was spontaneous and done solely to protect myself and the other officers from what I perceived to be aggressive actions by inmate Connell, an inmate with a known history of assaults, spoken threats, and disorderly conduct.

I did not see anyone kick or punch inmate Connell on June 25, 2009 nor did I kick or punch inmate Connell on June 25, 2009.

I never refused to feed inmate Connell a meal.

Ex. C at 1-4 (enumeration omitted).

Defendant Thompson states, in his Affidavit,

At approximately 1820 hours on June 25, 2009, while assigned as O Dorm Security officer at Union C.I., I escorted, along with Officer Inzar, inmate Connell, Timothy #T11890, housed in O2-124S, off of wing two. As we approached Sergeant Tate, who was located at the quarterdeck downstairs in O Dorm, he asked why inmate Connell had his hands handcuffed in front of his body. We explained that inmate Connell had complained of an injury to his shoulder, which Connell said he had sustained while doing exercises inside his cell. Inmate Connell said his shoulder injury was very painful, necessitating his hands not be placed behind his back for handcuffing.

As we explained this, Sergeant Tate stepped closer to us and inmate Connell and placed his left hand on the wrist restraints. Inmate Connell jerked his hands away in an aggressive manner. Sergeant Tate grasped inmate Connell's left rear shoulder with his right hand and forced him to the floor, face down, causing him to strike his head on the floor. Inmate Connell jerked and twisted his body and broke his hold, refusing multiple

10

orders to cease resisting. With the assistance of Officer Inzar, Sergeant Tate again grasped inmate Connell's upper left arm with both hands. At this time Sergeant Tate, Officer Inzar, and inmate Connell were on the floor at the entrance of the sergeant's office. During the struggle, and with the assistance of Officer Inzar, Sergeant Tate utilized his body weight to pin inmate Connell to the floor as he continued to resist by jerking and twisting his body, still refusing all orders to cease resisting. Inmate Connell finally ceased resisting.

Sergeant Tate then repositioned both of his hands to inmate Connell's upper left arm and, with the assistance of Officer Inzar, assisted him to his feet. Sergeant Tate then released his grasp and no further force was used by him. Once inmate Connell regained his footing, I uncuffed one of inmate Connell's wrists. Inmate Connell placed his hands behind his back and I re-secured the handcuff. Officer Inzar and I then escorted inmate Connell into the holding cell. We exited the cell and secured the door. No further force was used. Sergeant Tate notified Lieutenant Willie Watson, who responded to O Dorm. Sergeant Tate also instructed N Dorm Officer Bernard Anderson via radio to act as camera operator. Officer Anderson retrieved the O Dorm handheld video camera and began videotaping at approximately 1835 hours. Lieutenant Watson conducted his lead-in statement at approximately 1845 hours.

Inmate Connell was escorted to O Dorm medical treatment room, by Officer D. Gibstein and Officer J. Carter, where he received a post use of force physical conducted by SLPN S. Bickel. SLPN Bickel noted the following injuries: discoloration of the left eye and superficial abrasions to the forehead, nose, neck, upper torso, rear thoracic area

11

and left elbow. Officers Gibstein and Carter then escorted Inmate Connell back to his assigned cell and secured the door. Officer Carter removed the handcuffs through the handcuff port, at which time Inmate Connell stuck both arms through the handcuff port and refused to place them back inside the cell. Lieutenant Watson repeatedly ordered Inmate Connell to place his hands back inside the cell. Inmate Connell finally complied. Videotaping concluded at approximately 1905 hours.

I was not involved in the use of force against inmate Connell.

I never heard Sergeant Tate state to inmate Connell or anyone else that he wanted to fight Connell.

The June 25, 2009 use of force against inmate Connell was spontaneous and done solely for self protection from what were aggressive actions by inmate Connell, an inmate with a known history of assaults, spoken threats, and disorderly conduct. Sergeant Tate and Officer Inzar used the minimum amount of force necessary to prevent inmate Connell from assaulting anyone.

I did not see anyone kick or punch inmate Connell on June 25, 2009 nor did I kick or punch inmate Connell on June 25, 2009.

On June 25, 2009, neither I nor Officer Inzar asked inmate Connell if he was going to fight Sergeant Tate.

Ex. D at 1-4 (enumeration omitted).

Affiant Michael Esford attests that on June 25, 2009, he was assigned to deliver the mail. Ex. J. He further states:

I did not witness the spontaneous use of force on inmate Timothy Connell,

12

> DC#T11890, by Sergeant Tate and Officers
> Thompson and Inzar.
>
> I only witnessed the officers
> escorting inmate Connell from the
> quarterdeck to the holding cell after the
> spontaneous use of force was completed.
>
> I witnessed no excessive or illegal
> force by Sergeant Tate, Officer, [sic]
> Thompson, or Officer Inzar against inmate
> Connell.

Id. at 1-2 (enumeration omitted).

Inmate Joseph J. Luzier, III, attests that Plaintiff fabricated his story in hopes of getting money from the Florida Department of Corrections and the Defendants because he was angry that he had been made to move from one cell to another. Ex. K.

The Daily Record of Special Housing, for June 24, 2009, is marked both received and refused the evening meal. Ex. G. There is a notation that Plaintiff made an obscene gesture toward staff during "chow." Id. For June 25, 2009, it is noted that Plaintiff refused the evening meal. Id. Further notation states that Plaintiff refused to back away from the flap during evening meal. Id. On June 25, 2009, Plaintiff received a disciplinary report for disobeying an order (failure to back away from the cell door and show his hands in order for the officer to safely open the food flap and deliver the food tray), written by Officer Inzar. Ex. H. On July 1, 2009, he was found

guilty of this offense and received thirty days of disciplinary confinement.  Id.

On June 25, 2009, Plaintiff received a disciplinary report for assault or attempted assault on a correctional officer.  Ex. E.  Defendant Tate charged that when he placed his left hand on the wrist restraints, Plaintiff "jerked his hands away in an aggressive manner."  Id.  On July 1, 2009, Plaintiff was found guilty of the offense and received sixty days of disciplinary confinement as punishment.  Id.

A Report of Force Used was completed by Defendant Tate on June 25, 2009.  Ex. B.  Defendant Tate states that he placed his left hand on Plaintiff's wrist restraints, and Plaintiff jerked his hands away in an aggressive manner.  Id.  At that point, force was used.  Id.  An Incident Report was completed as well. Id.  The details of the incident were reported by Defendant Tate.  Id.  Lieutenant Watson, the Shift Supervisor, reported:

> I was not present in O Dorm at 1820 hours and did not witness the use of force. Officers Thompson and Inzar were counseled with regarding proper restraint procedures and instructed to always handcuff confinement inmates behind the back, unless they have a medical pass for handcuffing. Officers Thompson and Inzar will undergo additional training in proper restraint procedures.  Inmate Connell received a post use of force physical by SLPN Bickel[.]

Id.

14

A mental health referral was completed for Plaintiff. Id. The matter was referred to the Inspector General's Office for further review. Id.

Of note, although omitted by the Defendants in their submission of the Incident Report, Defendant Esford, on June 25, 2009, provided the following details of incident in the Incident Report:

> At approximately 1820 hours on June 25, 2009, while assigned as Food Escort Officer, I was entering O Dorm and was present on the downstairs quarterdeck. I **witnessed a spontaneous use of force involving Sergeant Wayman Tate, Officer Darius Inzar and Inmate CONNELL, Timothy #T11890, housed in O2-124S. I witnessed Sergeant Tate and Officer Inzar use the minimal amount of force necessary in order to prevent Inmate CONNELL from assaulting staff.** This incident was referred to the shift supervisor for further disposition.

Plaintiff's Exhibit A1 (Doc. #74).[4]

Major P. Jefferson concluded that Plaintiff should have been handcuffed behind his back as he did not possess a medical front cuff pass. Ex. B. Additionally, the officers violated a post order by cuffing Plaintiff in the front. Id. Also, he found staff used poor judgment in removing the wrist restraints prior to securing Plaintiff in a secure area. Id.

---

[4] Defendant Esford now attests that he did not witness a spontaneous use of force against Inmate Connell. Ex. J. No explanation is provided for this complete reversal in Esford's rendition of the incident.

The Emergency Room Record for June 25, 2009, shows Plaintiff alleged staff abuse. Ex. B. He complained of head pain. Id. The nurse noted discoloration to the left eye, perri-superficial abrasions were noted to his forehead, nose, neck, upper torso, posterior thoracic and left elbow. Id. The nurse was unable to notify the doctor because the phones were out of service. Id. Plaintiff was advised that the doctor would review the matter and there would be a medical call out the following day, June 26, 2009. Id. Plaintiff was sent to his cell. Id. Dr. Aviles reviewed the report on June 26, 2009, and he ordered x-rays for ribs bilateral 3 view, a sternum interpretation, and orbits complete interpretation. Ex. I. The results were negative. Id.

The Office of the Inspector General made a Report of Investigation dated August 17, 2009. Ex. F. The allegations were that Sergeant Tate, Officer Inzar and Officer Thompson used excessive force against Plaintiff on June 25, 2009. Id. at 1. It was found that Sergeant Tate, and Officers Inzar and Thompson violated a post order requiring cuffing behind the back. Id. Sergeant Tate and Officer Thompson were also found to have removed Plaintiff's restraints in an unsecured location after force was used. Id.

Plaintiff's allegation of excessive force was found to be unsubstantiated. Id. He alleged that Sergeant Tate grabbed him

16

by his handcuffs, took him into the Sergeant's station and hit him, and then Plaintiff fell and Officers Inzar and Thompson kicked him. Id. at 2. It was noted that there was no fixed wing video in the are of the alleged incident. Id.

Plaintiff's allegation that Tate and Inzar refused to feed him was found to be unsubstantiated. Id. It was determined that the Daily Record of Special Housing revealed that Plaintiff refused his tray on June 24 and June 25, 2009. Id.

During the investigation, Plaintiff's sworn audio recorded statement was taken. The Inspector said it contained the following, in pertinent part:

> When they got off of the wing, right by the water fountains Sergeant Tate grabbed him by his handcuffs and took him in the sergeant's office and began hitting him. He fell and Officer Inzar starting [sic] kicking him in his ribs and kicked him in his eye. Sergeant Tate was hitting him with his fist. Officer Thompson kicked him in the stomach. He denies telling the officers he had a shoulder injury and denies snatching away like the officers put in their report. He had to go to get x-rays. The nurse lied when she said he *(Connell)* had superficial injuries because he believes he had a fractured rib.

Ex. E, Report of Investigation at 4.

In his sworn audio recorded interview, Officer Esford said he did not witness the use of force. Id. at 5. He said that when he entered the dormitory, the officers were taking Plaintiff to the holding cell. Id. Defendant Cain stated in

her sworn audio interview that she did not witness the use of force. Id. She said her attention was on opening the doors for Officer Esford. Id. She said she saw Plaintiff and the officers as Plaintiff was being placed in the holding cell. Id.

Officer Inzar, in his sworn audio recorded interview, stated that Plaintiff "went off" when Tate grabbed the handcuffs. Id. The officers took Plaintiff down. Id. Inzar did not kick Plaintiff and he did not see Sergeant Tate and Officer Thompson kick him. Id. Officer Inzar said they did not refuse to feed Plaintiff. Id.

Sergeant Tate, in his sworn audio recorded interview, said there was an issue with Plaintiff's mattress, and he did tell Plaintiff to get his mattress off of the floor. Id. Tate said he did grab Plaintiff's handcuffs, seeing Plaintiff cuffed in front and not knowing what he would do. Id. Sergeant Tate denied taking Plaintiff into the Sergeant's station to hit him, and Tate said he did not see anyone kick Plaintiff. Id. Sergeant Tate said Plaintiff was supposed to be going to the nurses' station before all of this happened. Id. at 6.

Officer Thompson, in his sworn audio recorded interview, said they handcuffed Plaintiff in front and attached the restraint cable. Id. He said that Sergeant Tate did not take Plaintiff into the Sergeant's station and hit him. Id. Thompson said he and Officer Inzar did not kick Plaintiff. Id.

18

Upon completion of the investigation, Plaintiff's claims of excessive force and denial of meals were found to be unsubstantiated in the summary disposition/justification for downgrade/exoneration. Ex. F, Report of Investigation at 1-2.

Defendants' Exhibit L,[5] consisting of two DVDs, one entitled the Fixed Wing video (no sound) and one entitled the Hand Held video (with sound), have been reviewed by the Court.[6] In short, the Fixed Wing video shows a black male officer and a white male officer arriving at Plaintiff's cell door. Ex. L (Fixed Wing video). Plaintiff is dressed in white shorts/briefs and shoes, and he has a towel around his neck. Id. He has no visible injuries. Id. The officers handcuff Plaintiff in the front, through the food flap, utilizing a snatch cord/chain.

---

[5] These DVDs were submitted under seal because they show the internal structure of the prison facility and reveal the capabilities of the prison cameras. The structure of the prison and the capabilities of the cameras will not be mentioned in this order as the DVDs have been filed under seal to protect the security and safety of the institution.

[6] The DVDs were submitted to the Court with instructions for downloading a software program in order to view the videos. The instructions that came with the software were incorrect and the file names did not exist. Indeed, the file names did not match the instructions on the disc. **In the future, Defendants (and the Office of the Attorney General) shall submit DVDs that are readily viewable by the Court, without requiring the installation of software.** Not only is the Court concerned about the introduction of viruses into the Court's computer system, the installation and viewing of the DVDs took an inordinate amount of the Court's time due to the faulty instructions and the need to call in systems to complete the installation and to ensure that the software was virus free.

19

Id. After Plaintiff exits the cell, the white male officer takes a cord/chain and tucks it away. Id. The Plaintiff, handcuffed in front, walks towards the exit, followed by the two officers. Id. They all exit the wing. Id. There is no visible disruption or any conflict between Plaintiff and the two officers. Id.

Later on, Plaintiff is brought back on a wing, cuffed behind his back. Id. He has on white shorts/briefs and no shoes. Id. The towel is no longer around his neck. Id. He is returned to a cell by four officers. Id. One of the officers has a handheld camera and is recording Plaintiff's placement in the cell. Id.

The Hand Held video, with sound, shows Plaintiff being returned to a cell. Ex. L (Hand Held video). He has a black, swollen left eye. Id. He has visible scratches/abrasions on his chest and neck. Id. There is a visible bruise/knot on his forehead. Id. Lieutenant Watson introduces himself and states that it is June 25, 2009, at UCI, O-Dorm. Id. He says that there has been a spontaneous use of force in response to Plaintiff refusing to obey a direct order. Id. He further states that Plaintiff is awaiting medical treatment. Id.

Plaintiff is taken to the treatment room and Nurse Bickel examines him in the medical clinic. Id. For most of the examination, the officer holding the handheld camera records

from the hallway outside the clinic, through a glass door.[7] Id. When Plaintiff is taken to the rear of the clinic, the cameraman is allowed to enter and record the portion of the examination not visible from the hallway. Id. When the examination is over, Plaintiff, barefoot and in shorts/briefs, is returned to his cell and uncuffed. Id.

Once in his cell, Plaintiff refuses an order to back up and states that he is in fear for his life. Id. He stands with the flap open. Id. Lieutenant Watson departs, telling the cameraman to keep recording. Id. Plaintiff, prompted by fellow inmates telling him to speak while the camera is on, says that he was jumped on by three officers while he was handcuffed. Id. He explains that he was taken to the Sergeant's station and Sgt. Tate, a black male, jumped on him. Id. He claims Officer Thompson kicked/hit him in the eye and chest. Id. Plaintiff states he fears that his life is in danger. Id.

Plaintiff starts over, stating that he was pulled out for a shower and placed in cuffs in the front. Id. He says he stuck his hands out of the food flap because the officers refused to feed him tonight and last night, and he requests to see a lieutenant. Id. He asserts the officers are trying to

---

[7] During the examination, the two officers in the clinic block most of the view of the examination itself. Any statements made by Plaintiff to the nurse have not been recorded through the glass door of the clinic or are simply not discernable.

kill him. _Id_. He explains that they jumped him and took him to the ground, and then kicked/punched him in the head, shoulder, eye, chest and back. _Id_. When Lieutenant Watson returns to the cell block, Plaintiff asks to speak with the Captain. _Id_. Lieutenant Watson tells Plaintiff that they have to secure the cell, and then the Captain will speak with him. _Id_. Lieutenant Watson assures Plaintiff that he will take care of the evening meal issue. _Id_. At that point, the cell food flap is secured and the officers depart. _Id_.

## V. Plaintiff's Response

It should be noted that Plaintiff is proceeding on a sworn Amended Complaint (Doc. #18). Also, on March 11, 2010, he submitted documents, including a copy of his grievance of a sensitive nature, dated July 22, 2009. In that grievance he complains:

> On June 25, 2009 at approximately 4:15 p.m., when Sergeant W. Tate and Officer D. Thompson was [sic] conducting Count in O-Dorm/Wing 2 and both Officer[s] approached my cell O-2124S and stated "bring your punk ass out of your cell to shower." I asked Sergeant W. Tate if he was gonna give me a one on one and not jump on me in handcuffs and he told me "Yes." Then, at approximately 6:20 p.m., Officer D. Thompson and Officer D. Inzar entered O-Dorm/Wing 2 and approached my cell and asked me if I was going to the shower? I told them "Yes." The Officer (Thompson) then opened the Food Port Flap and I then stuck both of my hands out of the flap slowly by pushing the flap down. I then requested to converse with a Lieutenant and

22

both Officer[s] informed me that the Lieutenant was not coming down their [sic], to bring your pussy ass out. I then told them I am not coming out [of] my cell to get jumped on and that's when Officer D. Inzar then grabbed both of my wrist[s] with both of his hands and pulled them towards him in a[n] aggressive manner and ordered Officer D. Thompson to hurry up and cuff him up. Officer D. Thompson then placed handcuffs on me in the front of my body in direct violation of Chapter 33-602.220, F.A.C. Then, Officer D. Thompson placed a snatch on the handcuffs and attached the other end to the cell door handle and radioed the control station and ordered the cell door to be rolled open. I was then escorted to the Quarterdeck by Officers Thompson and Inzar and as I turned the corner to receive a shave, that's when Sergeant W. Tate grabbed me by the handcuffs, forced me into the Sergeant and Officer's Station and he commence [sic] punching me in the upper torso, chest, rib cage on the left side of my body. I fell to the floor and all three Officers begin [sic] kicking me in the stomach, chest and ribs. I was then kicked in the left eye and I begin [sic] yelling and all three Officers continued to kick me all over my body when Sergeant W. Tate yelled repeatedly "You gonna disrespect me any more?["] I then continued to yell louder and they stopped their Assault and Battery. I was then picked up off the floor and the handcuffs was [sic] placed behind my back by Officer D. Inzar and [I] was escorted and placed in the holding cell. Then, minutes later, the Lieutenant came to converse with me while I was videotaped and was then escorted to the Nurses' Station and examined by Nurse Bickel who documented all injuries sustained. Afterward[s], I was escorted back and placed in my cell. Then, on June 26, 2009, I was escorted to [the] Medical Department and examined by Dr. Julian Aviles who acknowledged all my injuries. Dr. Aviles then ordered that a

23

full body X-ray be conducted on me. Then,
on or about July 9, 2009, I was interviewed
by Inspector Merci from the Office of the
Inspector General and I provided a sworn
statement on tape of the incident. During
the interview, Inspector Merci acknowledged
the injuries I sustained by reviewing the
Injury Body Diagram.

During these events, I sustained
several injuries to my forehead, chest,
ribs on my left side, stomach and left eye,
which, was swelled [sic] shut and black.

Furthermore, I have been threaten[ed]
by the fore-mentioned Officers constantly
prior to the actual beating and I informed
several higher official[s] and my
complaints was [sic] totally disregarded.

Inmate Grievance dated July 22, 2009, filed March 11, 2010 (Doc.
#2). The grievance was denied on July 24, 2009, as the matter
had been previously reported and was already being considered by
the Inspector General. Response dated July 24, 2009, filed
March 11, 2010 (Doc. #2). The grievance appeal was denied for
the same reason. Response dated August 7, 2009, filed March 11,
2010 (Doc. #2).

Plaintiff has submitted inmate witness statements acquired
by the investigating officer during the investigation. Inmate
Ray Crosby states that he heard Officer Thompson and Sergeant
Tate threaten Plaintiff with bodily harm if he left his cell.
Exhibit D4, Witness Statement of Ray Crosby, dated June 26,
2009, filed October 6, 2011 (Doc. #74). Inmate James Bradley
states that Officer Thompson and Sergeant Tate did not enter

24

Wing-2 at feeding time and order Plaintiff to step to the back
of his cell, nor did these officers feed Wing-2 on June 25,
2009. Exhibit D4, Witness Statement of James Bradley, dated
June 26, 2009, filed October 6, 2011 (Doc. #74). Inmate James
Bradley also provided a Witness Statement stating that before
dinner was served, Sergeant Tate asked inmate Connell if he was
coming out tonight. Exhibit D4, Second Witness Statement of
James Bradley, dated June 26, 2009, filed October 6, 2011 (Doc.
#74). Inmate Bradley states that Plaintiff did not respond to
Tate's question. Id. At shower time, Connell attempted to hold
the food flap open and asked to see the Lieutenant about his
tray that was not given to him. Id. At that time, a black male
officer grabbed inmate Connell's wrists and C.O. Thompson placed
handcuffs on inmate Connell, using the belt on the cell door
handle. Id. The cell door was opened, and Plaintiff was forced
out of the cell with his handcuffs in front. Id.

Finally, the Witness Statement of Harry Neal states that at
approximately 6:20 p.m., he overheard Officer Thompson and Sgt.
Tate threatening inmate Connell at his cell door, saying "come
on out fuck boy, we gonna beat that ass." Exhibit D4, Witness
Statement of Harry Neal, dated June 26, 2009, filed October 6,
2011 (Doc. #74). The officers said, "we will even put your
cuffs in the front so u [sic] can fight back.["] Id. Neal

stated he did not see the assault but heard Connell's pleas for help. Id.

Plaintiff also submitted Defendants' Response to Plaintiff's Request for Admissions, highlighting the fact that Officer Esford's written incident report stated that he had witnessed the use of force, whereas in his oral statement to the inspector, he denied that he had witnessed the use of force. Plaintiff's Supplement (Doc. #71).

### VI.  Law and Conclusions

The Eleventh Circuit has set forth the standard for an excessive use of force claim for an inmate:

> The use of force constitutes cruel and unusual punishment where it is applied "maliciously and sadistically to cause harm." Skrtich, 280 F.3d at 1300.[8] Thus, in order to prevail on an excessive-force claim, a plaintiff must demonstrate that those who used force against him acted with a malicious purpose. See Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). In addition, a plaintiff must prove that a requisite amount of force was used against him. Hudson v. McMillian, 503 U.S. 1, 9-10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. (quotation omitted). In determining whether the amount of force used against an inmate was de minimis, a court may consider the extent of

---

[8] Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002).

26

the injuries suffered by the inmate. <u>Skrtich</u>, 280 F.3d at 1302. Nevertheless, a court ultimately should decide an excessive force claim "based on the nature of the force rather than the extent of the injury." <u>Wilkins v. Gaddy</u>, 559 U.S. --, --, 130 S.Ct. 1175, 1177, -- L.Ed.2d -- (2010).

<u>Vicks v. Knight</u>, 380 Fed.Appx. 847, 851 (11th Cir. 2010) (per curiam) (not selected for publication in the Federal Reporter). See <u>Wilkins v. Gaddy</u>, 130 S.Ct. 1175, 1178-79 (2010) (per curiam) (finding "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury"); <u>Logan v. Smith</u>, No. 11-10695, 2011 WL 3821222, at *4 (11th Cir. 2011) (per curiam) (not selected for publication in the Federal Reporter) (deciding the video and medical evidence did not flatly contradict the inmate's allegations; disallowing plenary summary judgment on the excessive force claim, finding it inappropriate; and determining the evaluation of the evidence is a matter for a jury).

Recently, the Eleventh Circuit, in <u>Hall v. Bennett</u>, No. 10-12869, 2011 WL 5903541, at *2 (11th Cir. 2011) (per curiam) (not selected for publication in the Federal Reporter) (citation omitted), being "mindful of the fact that the focus of the inquiry is on the nature of the force applied, not the extent of injury[,]" recognized that it was left with reviewing two competing, contradictory stories of what happened during an

alleged assault by an officer on an inmate, and found the record presented a material issue of fact, precluding summary judgment.

In Plaintiff Connell's case, the Court recognizes that apparently there were no witnesses to the actual use of force, other than the Defendants involved in the alleged use of excessive force and failure to protect.[9] Additionally, Plaintiff was examined after the incident by a nurse. Evidence of abuse or trauma was noted by medical staff. Plaintiff presented medical complaints and he had visible physical injuries.[10] The next day, x-rays were ordered, and apparently, pain relief medication was prescribed.[11] Thus, the medical assessments undertaken shortly after the alleged incident support Plaintiff's allegations of significant and recently suffered injuries.

Based on Eleventh Circuit precedent, the Court will decline to grant summary judgment in this case. Since Plaintiff's claim of excessive force survives the Motion for Summary Judgment, his

---

[9] Although at one point Correctional Officer Esford stated he witnessed the use of force, he later attested that he did not witness the use of force.

[10] Of significant import, the Court was able to view some of these injuries by watching the DVD of the Hand Held video.

[11] Neither party submitted medical records concerning Dr. Aviles' examination of June 26, 2009, records which may have been immensely helpful to the Court.

claim of failure to protect will also survive the Motion for Summary Judgment:

> a defendant need not participate in the use of excessive force against a prisoner to be held liable under § 1983 for cruel and unusual punishment. Skrtich, 280 F.3d at 1301. A defendant who is present at the scene and fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable. Id.

Logan, 2011 WL 3821222, at *2.

Although Defendants claim they are entitled to qualified immunity, "[i]n this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment . . . ." Skrtich, 280 F.3d at 1301. Although Defendant Esford claims he is entitled to qualified immunity because he did not witness the use of force, Motion for Summary Judgment at 20, he originally claimed that he witnessed the use of force. Plaintiff asserts that Esford witnessed the incident and failed to intervene when Plaintiff was being beaten by the officers, and Esford was in a position to intervene. The facts, as alleged, show that Defendant Esford violated a constitutional right, failing to intervene when Plaintiff was being beaten by correctional officers when Esford was in a position to intervene.[12] Additionally, the right was clearly

---

[12] An officer present at a beating who fails to intervene may be held liable even though he did not administer any blows. Velazquez v. City of Hialeah, 484 F.3d 1340, 1341-42 (11th Cir.

established on June 25, 2009, when the alleged failure to intervene occurred.

Finally, Plaintiff also raises the following state law claims: assault and battery and negligent failure to intervene and protect. Since the Eighth Amendment claims (excessive use of force and failure to intervene) survive the summary judgment stage and since the state law claims arise from the same nucleus of operative facts as the Eighth Amendment claims, this Court will exercise supplemental jurisdiction over the state law claims.

Therefore, it is now

**ORDERED:**

1.   Defendants' Amended Motion for Summary Judgment (Doc. #32) is **DENIED**.

2.   Defendants shall respond to the Amended Complaint (Doc. #18) within **THIRTY (30) DAYS** from the date of this order.

**DONE AND ORDERED** at Jacksonville, Florida this 25st day of January, 2012.

_____
UNITED STATES DISTRICT JUDGE

_____

2007) (per curiam).

30

sa 1/20
c:
Timothy Alan Connell
Ass't A.G. (Neff)